Dean PATTERSON, Petitioner-Appellant,

v.

BOARD OF REGENTS OF the UNIVERSITY OF WISCONSIN SYSTEM, Defendant-Respondent.†

Court of Appeals

*No. 82–1942.  Submitted on briefs June 6, 1983.— Decided August 9, 1983.*

† Petition to review granted.

For the appellant the cause was submitted on the briefs of *John S. Williamson, Jr.*, and *Habush, Habush & Davis, S.C.*, of Milwaukee.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *LeRoy L. Dalton,* assistant attorney general.

Before Foley, P.J., Dean and Cane, JJ.

CANE, J.   Dean Patterson appeals from a judgment affirming a decision by the Board of Regents of the University of Wisconsin System.  The board affirmed a decision by the University of Wisconsin Center System Appeals and Grievance Committee that the committee had no jurisdiction over a dispute concerning whether Patterson quit or was discharged from his position as a tenured instructor.   Patterson contends that he was denied his statutory and constitutional rights to due process of law because he did not have a hearing before an impartial tribunal to determine whether he voluntarily quit or was discharged.  Because we conclude that Patterson was denied due process, we reverse and remand with directions.

Patterson was appointed to the faculty of the Barron County campus of the Wisconsin State University System in 1969. He taught courses in geography, history, and anthropology. Patterson became a tenured instruc-

tor in 1973 and continued teaching at the Barron County campus of the University of Wisconsin Center System.

During the 1976–77 academic year, the UWC-Barron County Steering Committee received formal student complaints concerning Patterson's teaching. In December, 1977, the committee adopted a resolution requesting an investigation and evaluation of Patterson's work. Dean John Meggers advised Patterson of the impending investigation, and Patterson later requested that he be placed on sick leave for the second semester. His request was granted.

While Patterson was on sick leave, arrangements were made for him to teach two geography courses during the fall semester of the 1978–79 academic year. Meggers informed Patterson that Chancellor Edward Fort would reassign fifty percent of Patterson's workload for the year in consultation with the geography department.

When the fall semester began, no students had enrolled in either of the courses Patterson was scheduled to teach. Consequently, both courses were cancelled. On November 20, 1978, Daniel VanEyck, Associate Chancellor for Academic Affairs, wrote Patterson informing him that there was insufficient enrollment at the Barron County campus to assign him teaching responsibilities. VanEyck asked Patterson to meet with Meggers to discuss alternative assignments for the academic year. Patterson met with Meggers, who indicated that he wanted Patterson to do a project on campus compiling student profiles and demographic information. Patterson apparently agreed that the project was acceptable, and he was asked to begin work on the project as of December 4, 1978.

Patterson briefly appeared on campus on December 4, but did not report for work the rest of the week. Meggers informed VanEyck in memoranda dated December 15, December 22, December 29, January 5, and January 12, that Patterson had not reported for work on the

project assigned to him. VanEyck wrote Patterson on January 18, 1979, at Fort's request and with his authorization. VanEyck informed Patterson that if he failed to report by 8:30 a.m., January 23, 1979, for the work to which he had previously been assigned, the university would treat his absence as a resignation from his position. Patterson wrote to Fort informing him that he refused to resign while the investigation of his teaching continued. Patterson also stated that he was willing to teach classes, but he refused to accept other duties until fully cleared of all charges and then only after the geography department approved the other duties. Patterson finally indicated that he would neither resign nor accept the assigned student profile project. The executive committee of the department of geography and geology subsequently approved the project.

Patterson again wrote to Fort and indicated that he could not work while the charges against him were unresolved. He requested a leave of absence while the university proceeded with discharge or grievance procedures. Fort wrote to Patterson informing him that, although the investigation continued, no charges had been filed against him. Fort also indicated that Patterson's continued absences from work since December 4, 1978, were unexcused, and that the university was therefore treating his absence as a resignation as of January 23, 1979. Patterson replied that he disagreed with Fort's characterization of his conduct and demanded a hearing on whether he had resigned or was discharged.

Fort wrote to Patterson asking him to meet with VanEyck, Meggers, and Dr. Eugene Hartmann in Meggers' office to enable Patterson to offer a statement or evidence to refute Fort's conclusion that Patterson had resigned. Fort stated that Patterson could bring any person of his choice, including legal counsel, and that the

meeting would be tape-recorded. Patterson attended the meeting alone.

After the meeting, which Fort did not attend, Fort wrote to Patterson and indicated that, based on his review of the record of the meeting, he concluded that Patterson had resigned. Patterson asked the appeals and grievance committee to hold a hearing on the question whether Patterson resigned or was discharged and, if discharged, whether the grounds for discharge were adequate. The committee informed Patterson that, based on the evidence and arguments presented through correspondence among it, Patterson, and his attorney, there were insufficient grounds to conclude that Patterson's dispute was a "dismissal for cause" subject to the provisions of Wis. Admin. Code § UWS ch. 4 (1975)[1] and that the dispute was neither a grievance or complaint subject to Wis. Admin. Code § UWS ch. 6 (1975) nor an appeal as defined in Wis. Admin. Code § UWS 3.08 (1975). The committee also indicated that it did not have the authority or professional training to rule on "complex and subtle applications of case law."

Patterson appealed to the board of regents, which sustained the committee's decision that it lacked jurisdiction over the dispute, and concluded that the record established that Patterson was not discharged. Patterson appealed to the circuit court pursuant to sec. 227.20, Stats.[2] The court affirmed, concluding that Patterson had quit and that he was afforded due process in the form of the reviews by the appeals and grievance committee, the board of regents, and the circuit court.

Patterson does not seek review of the circuit court's conclusion that he quit and was not discharged. Patter-

[1] Wis. Admin. Code § UWS ch. 4 (1975) governs procedures for tenured faculty dismissals.

[2] Section 227.20, Stats., governs the scope of judicial review of administrative decisions.

son instead argues that he was entitled to a hearing before an impartial tribunal to determine that question, and that his right to procedural due process was violated.

Procedural due process imposes constraints on governmental decisions that deprive individuals of liberty or property interests within the meaning of the due process clause of the fourteenth amendment. *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976). To have a property interest in a benefit, a person must have a legitimate claim of entitlement to it. *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Patterson's property interest in his employment was created and defined by the terms of his appointment. As an instructor with tenure, Patterson's appointment was for an unlimited period, sec. 36.13(1)(a), Stats., and he could be dismissed only for just cause and after notice and a hearing. Section 36.13 (5), Stats; Wis. Admin. Code § UWS 4.01 (1975). Under these provisions, Patterson had a legitimate claim of entitlement to continued employment, which is a property interest entitled to the protections of due process.

If Patterson voluntarily quit, there would be no process due him because there would be no governmental action depriving him of a protected property interest. If Patterson was discharged, however, he would be entitled to the procedural safeguards mandated by sec. 36.13(5),[3] and Wis. Admin. Code § UWS ch. 4 (1975), which he did not receive. Fort's initial characterization of Patterson's termination as a resignation would, if

[3] Section 36.13(5), Stats., provides:

Procedural Guarantees. Any person having tenure may be dismissed only for just cause and only after due notice and hearing. . . . The action of the board in such matters shall be final, subject to judicial review under ch. 227. The board and its several faculties shall develop procedures for the notice and hearing which shall be adopted by rule under ch. 227.

erroneous, deprive Patterson of a protected property interest without Patterson having been afforded any due process. We conclude that once the dispute arose concerning whether he quit or was discharged, Patterson was entitled to due process because of the potential deprivation of his property interest.

Because we conclude that due process applies, we must determine what process is due. *See Goss v. Lopez,* 419 U.S. 565, 577 (1975). Procedural due process does not require adherence to inflexible procedures applicable to every possible situation. At a minimum, however, it requires that a deprivation of property be preceded by notice and an opportunity for a hearing appropriate to the circumstances. *Id.* at 578–79. In addition, a biased decisionmaker is constitutionally unacceptable, and our legal system attempts "to prevent even the probability of unfairness." *Withrow v. Larkin,* 421 U.S. 35, 47 (1975).

We conclude that Patterson did not receive the process due him. The dispute concerning whether Patterson quit or was discharged began when VanEyck, acting at Fort's request, informed Patterson that they would treat his continued refusal to do the assigned project as a resignation. Fort ultimately decided that Patterson had resigned, and he informed Patterson in writing of the decision. Although Patterson had a meeting with Van Eyck, Meggers, and Hartmann, Fort set up that meeting and designated who would conduct the hearing. After Fort reviewed the record of the meeting, he rendered a decision that required him to evaluate and review his earlier conclusion that Patterson had quit.

There is no evidence that Fort had a personal stake in the outcome or had animosity toward Patterson. The United States Supreme Court has recognized, however, that officials directly involved in making recommendations or determinations cannot always have complete

objectivity in evaluating them. *Morrissey v. Brewer,* 408 U.S. 471, 486 (1972). It is therefore unnecessary to impugn the motives of one making an initial decision or recommendation in order to require that the independent decisionmaker examining or reviewing that decision be independent. *See, e.g., Withrow,* 421 U.S. at 59 n. 25; *Morrissey,* 408 U.S. at 486.

Once Fort concluded that Patterson had resigned and informed him of this by letter, minimal due process required that Patterson receive notice and an opportunity to be heard before an impartial decisionmaker. Although Patterson had an informal hearing, it was not before an individual or body that would make the ultimate determination. Patterson also had no opportunity to confront Fort at the hearing because Fort did not attend. After the hearing, Fort reviewed his prior decision that Patterson had resigned. Because of the risk of bias in that procedure, Patterson should have had a hearing before a decisionmaker other than the one who initially handled and who was directly involved in the dispute. We also conclude that the reviews by the appeals and grievance committee and the board of regents were insufficient to afford due process because their reviews—or what could be characterized as their refusal to review—were not based on a decision rendered by an impartial decisionmaker.

Patterson argues that because he was denied due process, he should be reinstated as a tenured faculty member and receive back pay. We reject that argument. We conclude instead that the remedy Patterson is entitled to is notice and a hearing before an impartial decisionmaker on the issue of whether he quit or was discharged.

Our conclusion does not mean that the university must go beyond the university system to find an impartial

decisionmaker. Although both the appeals and grievance committee and the board of regents are familiar with the dispute, mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not disqualify it as a decisionmaker. *Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 493 (1976). What is required is that Patterson receive notice and a hearing before a decisionmaker not directly involved in making the initial determination that he quit. We therefore reverse the circuit court's judgment and remand to the board of regents with directions to arrange for proceedings affording Patterson notice and a hearing before an impartial decisionmaker on the issue of whether he quit or was discharged. If Patterson was discharged, then he is entitled to the required hearing on whether his discharge was with or without cause.

*By the Court.*—Judgment reversed and cause remanded with directions.